et al. Appellate v. McDonald's Corporation et al. Mr. Plotka for the Appellate, Mr. Bottiglieri for Appellate McDonald's Corporation et al. and Mr. Schwinn for Appellate RAH of Washington, D.C. Inc. May it please the Court, my name is Brendan Claproth and I represent Paul and Abigail Casey. This is a lawful death case brought by Paul and Abigail Casey on behalf of their son, Patrick Casey. On September 23, 2011, Patrick Casey was attacked and killed in a McDonald's restaurant. This particular McDonald's restaurant had a history, significant history. He wasn't killed in the restaurant. He was killed just outside the restaurant. But this restaurant did have a significant history of violent crime occurring in the restaurant. And despite that knowledge of the crime, the restaurant failed to take reasonable precautions to protect their customers, including Patrick Casey. In addition, the assailants at the time of the attack were intoxicated. They had been to eight bars preceding going to McDonald's, consumed dozens upon dozens of alcoholic beverages. At approximately 1.38 a.m., they closed up the tab at Cadillac, walked across the street to McDonald's restaurant where the attack occurred. There are three issues before the Court on appeal. First, the District Court error in dismissing the wrongful death claims on the basis that they were untimely. Second, the District Court error in dismissing the claims against the McDonald's defendants on the motion for summary judgment. And third, the District Court error in dismissing plaintiff's trash shop claims against the bar defendants. If the Court has any questions, I'll start with the wrongful death issue. So Patrick Casey died on September 27, 2011. Approximately six months later, the D.C. Council passed a law. The D.C. Wrongful Death Act of 2012. This law enlarged the statute of limitations from one year to two years. Plaintiffs filed their wrongful death claims within that two-year limitation period. Nevertheless, the District Court dismissed the wrongful death claims on the basis that the one-year, the prior one-year statute of limitations applied. Court error for three reasons. First, when a new statute of limitations is passed by the largest limitations period, the new limitations period applies to existing, unexpired claims. Second reason for court error is that procedural statutes apply retroactively. And the circuit has held that statute of limitations are considered procedural statutes, which apply retroactively. And third, the D.C. Council clearly intended to pass, in passing the Wrongful Death Act of 2012, to enlarge the statute of limitations in relation to victims of the South Capitol Street murders that occurred in 2010. And that's your strongest point in some ways, right? Because we know from the resolution that that's what the D.C. Council was motivated by, that they intended to bring those claims within. And if that's true, then you win, if that's true, right? That's correct. And the important thing is those claims for those victims had already expired. So the statute actually revived those expired claims, whereas here, the statute of limitations never expired. I mean, that's icing on the cake. But the threshold point is that we know, if we believe that part of the D.C. Council's actions and its motivation as expressed in the resolution, we know that they intended it to apply retroactively. This is a helpful question to you. Yes, I agree. Yeah. But what about the legislative history that uses the phrase prospective? How do we reconcile those two things? So I think there's two points there. First is the statute itself and the resolution clearly state the purpose and who this statute of limitations was to apply to. And judicial panelists tell us that the analysis is not fair in the plain text of the statute and the resolution. There's no need to go to the legislative history because we know typically committee reports are not drafted by the entire council, just a few members of the particular committee. And the second point is, I think, the interpretation of the word prospective, as we know from the Wilson v. Pena case, doesn't necessarily mean that the statute – I think it's too far a logical leap to say because the word prospective was used that it's not meant to apply retroactively. Because in Wilson v. Pena, the court said basically what this statute does is it applies to prospective events, namely the filing of a lawsuit. With respect to the McDonnell's defendants, as I stated earlier – I'm not sure that's your strongest point, but I'm not sure you need it either. I mean, the first point is that the prospective was in the legislative history. But if it were in the text of the statute and we didn't have the reference to South Capitol, a statement that this is intended to be prospective would be problematic, I would think. But in any event, you don't need to climb that hurdle necessarily. Or read in the context of revising the South Capitol Street claims. I'm sorry? Or read prospectively in terms of revising the South Capitol Street claims. I mean, that's another way to reconcile the statement. Because the district court relied on that, all right, and didn't look at the South Capitol. That is correct. It was in the record with respect to the resolution and the history of the South Capitol Street murders. And I think the analysis should stop just looking at the statute itself and the resolution. So with respect to the McDonald's sentence, this particular McDonald's, as stated earlier, had a significant history of violent crime. And because of that significant history, it created a heightened foreseeability that if the restaurant did not take reasonable precautions to keep their customers safe, that customers would be injured. Where does that beginning end, though? That's the problem I have with this part of the case, which is, you know, lots of McDonald's around the country have fights after school, after hours, after ones that are near bars. That's pretty common knowledge. And it's not just McDonald's, to state the obvious. So I don't want to limit it to them. When is the duty, at least under D.C. tort law, imposed for a diner, a McDonald's, to have a security guard present? So there's no bright-line rule. What we can do is look to NOVAC, the NOVAC decision, where this circuit held staff members testifying that fights would occur once every two weeks to a month was sufficient to establish the heightened foreseeability requirement. And here, we have even more than NOVAC. We have staff members saying that fights would occur once a month. We have video evidence that was independently obtained, taken by customers, detailing violent altercations in the McDonald's restaurant. We also have NPD incident reports that show violent assaults occurring within the preceding six-month period. So I think based on NOVAC, we have more evidence than was established in NOVAC, and therefore there is a heightened foreseeability requirement. But NOVAC was a case involving a nightclub, a place where alcohol is actually served. And we know that, you know, as they say, sometimes there's a fight in every bottle. So how do we extrapolate NOVAC to McDonald's, I guess, to kind of get to Judge Kavanaugh's question? Sure. So with respect to the rule articulated in NOVAC was that to establish the heightened foreseeability, which creates the legal duty, you look at is there a special relationship, business invite to work, business invite to eat, which exists in both NOVAC and this case. And then you look to prior similar crimes. And that's the analysis as far as creating the legal duty. And we believe that the prior similar crimes here far surpassed those in NOVAC. But does this mean every McDonald's in D.C. or in the country, if the D.C. tort law is consistent with other states, has to have a security guard? And if not, okay, let's say just some McDonald's. And, again, I don't want to limit to McDonald's diners, fast food restaurants,  common knowledge. So do all those have to have security guards, which would be a pretty big change, I think, in a lot of practices at diners and restaurants around the country? I think that's a great question. And I think what the national standard of care requires is that McDonald's restaurants that have this level of violence and this history of violence, the answer is yes, they are required to have security guards. And they're also required to call 911 when it's evident. And is there sufficient evidence, you think, or why do you think there's sufficient evidence that there is a national standard of care to that effect in the record? And the expert talks about a few things, but didn't seem to go to support a national standard of care necessarily. Well, looking to the Duterte decision and the Briggs decision to establish national standard of care, we looked at several things. One, have comparable facilities adopted this standard? Two, has this standard been promulgated? Three, is this standard generally known? And four, is this standard or methodology commonly used within the industry? And I think the expert here, Mr. Foster, established all those factors, even though you only had to establish one, with respect to comparable facilities. There is a deposition of a corporate designate for the 14th Street McDonald's. The two McDonald's, I mean, first of all, we're limited to McDonald's. McDonald's may be ahead of the game on security guards, but the idea that every food establishment that's near a bar that's still open at closing time has a security guard, I mean, there's no evidence to that effect in the record. Well, and I don't think the question is necessarily just proximity to a bar, but it's having a significant history of violence. For example, there might be a wine bar nearby or a 24-hour diner, but if there's not that level of violence, then no, a security guard would not be required. And to the point that there's two McDonald's identified, there was a motion to compel a file dealing with that specific information, you know, the existence of other McDonald's restaurants in the Washington, D.C. area that had security guards in place. And there's documents that show us that, but the motion was not even decided before the motion was submitted. On the bars, can I ask a question about that, which is the complaint, so that's tossed on a motion to dismiss. That's correct. Okay, on proximate cause grounds. All right, and the question is, do you have enough in the complaint with all the bars that are still in the case to keep them in the case on proximate cause? And you talk about OZO in some detail, and I'll find the paragraphs here. I think it's 28, 29, and 30, but there's not necessarily the same kind of detail with the other bars. Are they all? Well, the bars are remaining in the case. They are remaining for a reason, and that deals with OZO and Camelot at this point. The complaint does say, paragraph 23, that, you know, details that the assailant had been bar hopping from the night of questioning and identifies those bars as the bars they went to. At each of those bars, they were served while they were intoxicated, paragraph 24 of the complaint, and this is Joint Appendix 34. And then, according, and at the time we filed the complaint, one of the evidence that we had was the balance chart, one of the last bars, said that the assailants were drunk and out of control. And this was the last bar they went to prior. That's OZO. That's OZO, right? That's correct. Where is Camelot in the sequence? Do we know? So, what discovery has shown that Camelot, they closed off their tabs at 138 a.m. for Camelot, finished their drinks, stopped by OZO briefly, and then went straight to the McDonald's restaurant. And we've done that through credit card receipts. So it's number seven in the chain. It's actually, yes, that's correct. It's number seven. And approximately one hour before the actual assault, that's when they left OZO. And, again, no, I think the question, and I think Rong Yao and Marissa are very clear, that the question of proximate cause goes to the jury. And we believe that the pleadings here establish a plausible claim for a tram shop violation under the D.C. Code. And the question of proximate cause should not be decided on a motion to discuss, but rather before a jury. Well, at a minimum, you would say, after discovery, see what's out there. That is correct. I see I'm past my time, so. All right. We'll give you some time on that. Okay. Thank you. Good morning. Good morning. May it please the court. I'm Joe Bottiglieri on behalf of Kumri and McDonald's Corporation, which I'll refer to as McDonald's Defendants. There are a number of reasons in our brief why we believe that Judge Leon's decision granting summary judgment should be affirmed in this case. I'd like to touch on three this morning. That is plaintiff's failure to articulate a national standard of care. The requirement under GCK's law of heightened foreseeability and proximate cause. So, first, even if plaintiff proved that McDonald's Defendants had a duty, which I don't believe they have here, plaintiffs have failed to articulate a national standard of care. Are you not dealing with the wrongful death thing? Sorry to interrupt. I wasn't going to touch on that this morning, Your Honor. I'm happy to answer questions. Did you all split that up? Got it. That's fine. I just want to make sure someone's going to deal with it. Yeah.  Sorry, you're on national standard of care. How can they, I guess, how is it appropriate to decide that issue without deciding the motion to compel and allowing plaintiffs some discovery on the practices of McDonald's in the region? Yes, Your Honor. So, the motion to compel was specifically limited to other McDonald's restaurants in the city. And I think in the Briggs case, this court made it very clear that we're not just dealing with the standard for McDonald's. McDonald's could have a security guard in every restaurant and be way above the national standard of care. That doesn't create liability for them. It doesn't raise the duty bar. This court has said, the D.C. Court of Appeals has made clear that the plaintiff needs to show a national standard of care. They need to show what's done in the industry. That there may be manuals, there may be practices that a particular restaurant or a particular company, in this case, practices, but that does not create a standard of care for them. So, in that regard, I don't think that that motion to compel would assess plaintiff's counsel. Excuse me. The only thing plaintiff's counsel has been able to point to in this case is Mr. Foster's opinions, which are really nothing more than his say-so. The expert, his testimony is not sufficient if it's just relying on his own personal opinion. What about his methodology argument? Yes, Your Honor. I think that fails for several reasons. Mr. Foster relies on this IAPSC, or International Association of Professional Security Consultants. First, that's a methodology for performing risk assessments. It does not say that the national standard of care, what it is for quick service restaurants like this McDonald's restaurant. It doesn't specifically say that these restaurants... If it's a risk assessment, why is that irrelevant or improperly used? I didn't see that argument being made. Well, Your Honor, it's nothing more than a methodology... How is it determined? I'm sorry? Excuse me, I interrupted. No, it's nothing more than a methodology for security vendors like Mr. Foster to assess what their opinions are in terms of the security that a particular restaurant should have. It's not a standard that says you should have security guards. No, I understand the difference between the methodology and the standard. But he said he used the methodology and he plugged in certain information and he reached certain conclusions. So why is that not sufficient? Because that does not comply with D.C. law. D.C. law specifically says that you need to know what other, in this case, restaurants are doing in the industry. So the restaurants that serve liquor would be outside. That's correct. All right. So we're just talking about... How narrow is this category? Fast food restaurants generally? Or those open after midnight? Or those open in urban areas? Well, that's a good question, Your Honor. I think that's open to debate and that's part of the problem here. I think the purpose, one of the purposes or the main purpose, perhaps, of the standard of care is to make sure that people know specifically what specific conduct which they are required to conform. And in this case, we have really nebulous after the fact opinions. So the argument here, as I understand it, is lots of violence at this particular location. It's located in a part of the city where there are a lot of these bars. The bar is closed. People come to this location, get some coffee, hamburger, sober up. So you have this history. It's documented in police files that arguably would certainly put on notice that maybe some special security is needed at this particular site. So I thought that's what Mr. Foster was focusing on. Am I incorrect? Well, I think he was, although we would argue with the position that there was lots of crime and this was such a dangerous area. This is right at DuPont Circle at M Street. My office is a half a block away. You're not there at 3 a.m. on a Saturday night. Maybe you are sometimes. Maybe 30 years ago. But even looking at what the plaintiff has set forth, we're talking about 11 acts in the last 26 months before this incident. It does not rise to that level of the heightened foreseeability that DC requires. Suppose everybody went to intensive care and, you know, ended up crippled, paralyzed, et cetera. How much do you need to show is what I'm trying to argue. If, as you say, the whole purpose of the national standard is to give notice. And McDonald's itself doesn't say you have to have a security guard, but it does indicate you ought to take into account the circumstances you face. And, indeed, we have this consultant who could assist you in making this type of evaluation. So that the corporation itself has recognized there may be circumstances where additional precautions are needed. And DuPont Circle during the working day is a different place than DuPont Circle at night. No, that's true, Your Honor. But to answer your question, under that scenario, plaintiff's expert would need to look at other similarly situated restaurants across the country. And come back and testify or present a report as to what those restaurants do. How do they deal with it? I'm just thinking about the plaintiff. The plaintiff has to hire an expert. They're not going to spend $2 million, you know, preparing an expert testimony. And I don't understand that to be what the D.C. Court of Appeals is requiring. And it seems to me the question is whether, where you have a corporate organization that has put franchisees on notice, and you have a history of violence such that, at a minimum, you're going to call 911. Or you're going to hope that a police officer is cruising by and you signal it. I just wonder how much more a plaintiff has to show for a national standard of care. I think the requirement under D.C. law, Your Honor, is very specific. And the plaintiff would have to show, they would have to point to other similarly situated restaurants across the country and look at what they do. And that D.C. law is very specific about that. What I'm trying to get you to grapple with here is the national corporation has already recognized that there may be problem areas where additional security is needed. So then an expert comes in and says this particular area and this particular location has had a series of problems. And we can document them. And so this is not a Wendy's serving school children, you know, first graders at the school. This is a very different, very sophisticated area that has a lot of criminal history associated with it. So if you're going to have a McDonald's or a Wendy's or anything in this area, you're probably going to need some extra security for after midnight. That's what the expert said, didn't he? I think in part that's what he said, Judge. The problem is it's simply his own opinion. It's not based on anything other than him saying that he did a risk assessment based on this methodology. It's not based on any standard of care. And I think following up on Judge Kavanaugh's point earlier that, you know, where do you draw the line as to when a security guard is needed and when it isn't? And I think under the Briggs case, I think under the Varner versus District of Columbia case, I think the D.C. Court of Appeals has been clear and this court has been clear that a national standard of care has to be established. And that's not true. Doesn't Clark say or suggest that it can be established by looking at comparable facilities and you don't necessarily have to have, you know, done a comprehensive survey of everywhere around the country? That's correct, Your Honor. I don't think a comprehensive survey needs to be done. But I think enough needs to be done in order to be able to testify as to what the national standard of care is, what the duty is that's established based on what other similarly situated restaurants are doing. And that was never done in this case. In this case, Mr. Foster simply just gave his opinion and nothing more. Well, he was called as an expert witness, correct? And he submitted an expert report. So I didn't see, he wasn't disqualified as being... No, he wasn't disqualified, Your Honor, but Judge Leon did find that he failed to articulate a national standard of care. And I understand that and I understand the case law and I thought you might be arguing to me that, well, Novak tightened up the Briggs standard. But I just wonder what that means when the national organization has recognized that, not that everybody needs a security guard, but there may be circumstances. And then an expert says, look, we have this history of crime, violent crime. It's continuing. The location. And he says, you know, looking at this risk assessment, it is my opinion that you need a security guard. So that is what you're going to get in an expert report. And the fact that somebody in Utah in a rural area doesn't have a security guard when they have a franchise or a McDonald's, it's very irrelevant. But two things, Your Honor. With regard to the national organization, the Briggs case made it clear that plaintiffs can establish a duty of care based on the internal policies of a particular company. And the McDonald's manual, to be clear, never suggested that, you know, you have to hire security guards in this type of circumstance. They talked about when security guards might be helpful for crowd control, not applicable here. Robberies, not applicable here. So the internal manual doesn't even apply here, that McDonald's has. But your second point with regard to what a restaurant in Utah might be doing. You need a security guard if you have robberies, but not if people are involved. Well, Your Honor, it's just that they don't think it would be helpful. Well, I'm trying to think of the reverse. If McDonald's were the plaintiff and trying to present expert testimony, you have the resources that you could come in with a comprehensive statement. I don't see that's what the law is requiring. But I do get your point. I don't want to. But I don't think it would take a lot of resources for the expert to ask around and find out what the standard is. Your point is that the standard isn't, or correct me if I'm wrong, there isn't such a standard. That's correct, Your Honor. There is no specific standard. And if there is one, he needs to find it and point it out, which he hasn't done. So there are no national guidelines or anything like that. No. It would have to be an empirical study. Well, I don't know that it would need to rise to an empirical study, but he would certainly need to find out what a similarly situated restaurant, not one in a rural area of Utah, for example, but a similarly situated restaurant, what those other similarly situated restaurants, not just McDonald's, but all companies are doing. Do you agree that the motion to compel would have provided additional information or that's what the plaintiff is seeking? Not at all, Your Honor. And why would that information be irrelevant? Because he's simply asking for what other McDonald's restaurants in the District of Columbia are doing. And what McDonald's is doing does not create a standard here. It could be above the standard. It's hard to pick up on Judge Rogers' point to establish this then, but maybe that's where the law is. I don't know, Judge, and I've thought about that. And, you know, you would think, well, if a security expert is being hired, they would have a good sense of how to go about establishing that. And maybe it's talking to other experts in the field. Maybe it's talking to the National Restaurant Association. Maybe it's talking to other associations and trying to figure out what restaurants do in these types of circumstances and then come back. Of course, we're not the final arbiter. The only question here is whether a jury should be the final arbiter of whether there's sufficient evidence of negligence by not living up to the national standard of care. I mean, the traditional function of tort law was to push safety innovations based on juries' evaluations of the costs and benefits of various measures. Yes, Judge, but the question of duty is a question for the court. Right. I understand the case law now. I take your point. But this all grew up in context where there were national standards that were promulgated by the electricians, by the plumbers, et cetera, by the construction industry. Nobody cited any guidelines from the National Restaurant Association. And, indeed, you can see where they might have a conflict of interest in doing so in saying that everybody needs to have security guards. And I agree, Judge. But, for example, in Novak, there weren't promulgated standards, but the expert talked about how every other bar that he's looked at or known posted a security guard at the door for when people are leaving. They couldn't think of a bar in the District of Columbia where they didn't do that. You know, those were the types of things that they presented to establish a standard of care. None of those things were done here. We simply had Mr. Foster's personal opinion on what should have been done, and our point is that under D.C. case law, that's inadequate. I'm over my time. But you had a couple of other points. Do you want to make them? Yes, I was going to touch on proximate cause and the heightened foreseeability. I think we touched on heightened foreseeability in discussing Novak. And I would just like to point out that what we're talking about here is 11 acts within the previous 26 months. And this was also a situation where Patrick Casey could have walked away. He could have chosen not to confront the ward group. So when you look at the sliding scale analysis that the D.C. Court of Appeals applies, this in our- That's going to be true in every fight. Someone could have walked away. Well, right. But it wasn't like he was in our custody as a school or he was in a hospital room. So don't go to McDonald's after midnight. I'm sorry? So the message is don't go to McDonald's after midnight. No, Your Honor. I think the message is that we were not in control of him, and under the sliding scale analysis that the D.C. Court of Appeals has applied here, that there is a heightened foreseeability that the plaintiffs have not met here. Lastly, with the proximate cause, with regard to proximate cause, and I know the bar defendants are going to address that as their concern, but with regard to the McDonald's defendants, I think it's important to realize here that we have video surveillance. And there's a counter on the video surveillance. And it shows the timing. And really what we're dealing with is the last 20 or 30 seconds, arguably in the light most favorable to the plaintiff, when maybe things have started to get heated, in the last 20 or 30 seconds. And under that scenario, there wasn't anything that a security guard could do other than ask them to leave, which they were doing anyway. Or even, you know, before the punch was thrown, there just wasn't, even if 911 was called at that point, there just wasn't anything that could be done. So prevention. All right. We will hear from counsel for RAH. Thank you. I have a question. RAH of Washington and Osceo, which I referred to in our brief was the nightclub defendants, it could be bar defendants or nightclub defendants, whichever. The judge, you know, improperly concluded that none of these bar defendants, if you will, could be held legally responsible for the unfortunate death of Mr. Casey because it was the direct result of an intentional and possibly criminal act of Jason Ward. There's really two components to it. They both turn on foreseeability. Can we talk about the wrongful death statute first? Your Honor, I was not prepared to address that argument. I will say, though, that we were going to submit on, because of time constraints, we were going to submit on a brief. As I understand the argument, I can tell you it was there at the time. I think that the point is that at the time of the event that gives rise to the claim, the statute of limitations was one year. And that statute had not yet expired when the law had changed. Yeah, but this is a question. I'm just going to throw out my theory, and you can respond, or other counsel can respond. This is a question of state law, in this case, D.C. law. And the question is whether the subsequent statute, expanding the statute of limitations, applies here retroactively. I'll use that word. And if you look at the resolution that says this was specifically designed for the South Capitol Street murders, it seems open and shut as a matter of D.C. law that, yeah, it was designed to expand the statute of limitations to two years. And there you go. You don't articulate like that would be unconstitutional, which I don't think it necessarily would under current law. So it's just a matter of state law. And the number one response to that is, well, there's something in our committee report that says prospective. And my response to that would be it's a committee report, and it's even weaker in this case because the committee report seems to be directly contradicted by the resolution, which was passed by the city council. It wasn't a resolution. I don't know if that wording came into the guts of the folks in the actual final version of the law that this was designed to help the people in that event. Okay. The fact of the matter is, you know, Right. Well, I have your briefs on that, so. To look at the retroactivity would have to be in the law itself. That's what I understand the argument. Okay. But I want to talk about foreseeability and the effect of duty under common law How can that be done on a motion to dismiss? Proximate clause. In a case like this. Yes. In a case like this, defendants allege that Mr. Casey was killed by Jason Ward more than an hour after he was served the last beer at any of the bars and a block away, arising from really a dispute. Suppose the bar had served someone who then went out and got behind the wheel and ran someone over. That has been recognized as a legitimate claim in the District of Columbia since the Stowe case. And how is this different? Even if the accident is. This is a case that's completely different, where I think it's because in Stowe and in the later cases as well, they've always talked about a bar could be responsible if an injury of the kind that the statute was designed to prevent occurs. That is, and they say it right in the first sentence of Stowe, and also in their holding, accidental injuries. And in the later case of Jennifer, in that case where a young man, a 19-year-old man got lost and ended up on Rock Creek Park. What if the customer goes out and intentionally, to the extent you can when you're drunk, intentionally runs someone over? Well, that's where we say that the court properly drew the line and this court should also. Does that line make sense to you? I mean, a bar serves someone to the point that they're totally done and it's known. I'm not saying those are the facts here, so just take my hypothetical. It's obvious that the person is completely out of control and drunk, and the person goes out instead of getting into an accident driving home, intentionally runs over, you know, someone they're having a fight with outside. I don't think there's any support for that in the D.C. law, and the reason is because the Alcohol Beverage Control Act, as interpreted by the D.C. Court of Appeals in Stowe and also in the later case of Jennifer, restaurants versus Woodward restaurant, held that these were accidental injuries of the kind that were intended to be prevented by this regulation. And if you think about it, in terms of duty, which I think the court's decision turned both on lack of duty, and of course the ability, and also on proximate cause, which is not sufficient facts to judge temporal and causal relationship. Sorry to interrupt. It's very hard to do that on a motion to dismiss. I can see it if you go through discovery. They're just kind of standard intoxicated rather than really out of control intoxicated at a bar, but we haven't been through discovery. All we have are the allegations and the complaint here. Well, what I read on it is the line has to be drawn, and it has to be a clear line of demarcation. Judge Leon and a lot of other courts across the country have drawn that line between accidents due to the effects of alcohol impairing most of their ability to drive a car, which everyone recognizes is a foreseeable risk and something that we've all recognized that there's a lot of support for, and it's fair that they should be responsible for that. On the one hand, accidents, and where they draw the line, on the other hand, intentional or criminal acts, such as, in this case, sucker punching a guy and knocking him full. Wasn't it an accident in the sense that it was not intended to kill him? Well, no. He intended to punch him. He didn't intend to kill him, presumably. I mean, who knows? It was an intentional act, and he intended to put him down. He intended to hurt him, which is where the court has to draw the line. Otherwise, where would you draw the line? I agree. You can't leave it open to a jury to decide if this philanderer who then, you know, maybe sexually assaulted somebody on a train, whether the bar should be responsible for that because they served him a beer an hour and a half ago? It's not just serving a beer. That's the thing. I just want to challenge that because I understand your concern, representing your client, that every customer who goes out and does something stupid afterwards, which is going to cast a wide net, you don't want to be liable for all that. But it's someone who's obviously out of control and an immediate risk. The code says if you serve someone who's intoxicated or underage, then a bar owner could be liable for the accidental injuries that flow from that intoxication, but never any intentional. There's never been anything anywhere that would extend the law to cover intentional injuries. The law of the district funded for quite some time. So DUI, I just want to make sure I understand this. So like a customer is totally wasted, goes out and does a DUI and runs someone over, the bar owner can be liable, but if the guy goes out and rapes someone, not liable? No. You wouldn't be liable for, well, you're right. That's an example. You're not liable for, you are liable for accidents, but not intentional acts, crimes. So DUI is yes, rapes, murders, assaults, no? The person charged with DUI or causing an accident didn't go out intending to murder that person. If he did, then I'd say that we wouldn't be responsible for that either. And what's the best case law for that? The best case law for that is the... Or is it the absence of case law? No, it's both cases. The leading precedent here is Sue... Sue, rather, and Jennifer. And I wanted to talk about Marussa because the appellants rely entirely on Marussa. I apologize for this. I need to point out something that wasn't... I need to amplify something that wasn't covered well enough in our brief. We talked about how Marussa was not finding because it was after the Home Rule Act, after the Courts Act. And it was really not that helpful because it doesn't give much factual context. I think we know that the police officer, Clark, was exceedingly drunk and shot his gun as soon as he left. But one thing I didn't cover, which I think is very important to cover in this duty context, is that Marussa was decided before the litany of cases coming out of the D.C. Court of Appeals that requires a heightened standard of care to be shown to give rise to a duty to protect somebody from an intentional criminal act. So, again, that foreseeability, and it's only, as Judge Scalia put it, it's really a matter of fairness. When an intervening act involves a criminal, rather than negligent conduct, the question is not simply whether the criminal event is foreseeable, but whether a duty exists to take measures to guard against it, which is ultimately a question of fairness. And you can analyze it just as it's always a matter of law for the courts to decide, and you analyze it based upon several factors, the foreseeability of the harm, the degree of certainty that the plaintiff is going to sustain that injury, the closeness of the connection between the negligent act and the injury, the moral blame that goes with it, and the policy of preventing harm. Then you decide, that's probably, of course, to decide whether there's a duty in the first place, And the Court of Appeals has held, in a series of cases from Safeway, that was Safeway in 1979, through Potts and Bailey, and we started in our briefs all the way up to DeSalvio in 2009, that in order to be held liable for an intervening criminal act, there has to be a heightened standard of foreseeability such that you know, with some degree of precision, that this crime is going to occur. You've got some drunk guys coming in at night, you know something's going to happen. They're not sitting at the bar, or sitting at the table, calmly eating and drinking coffee. And so, maybe you're lucky, and they leave without anything happening. But at the point a tussle starts, the manager goes in the bathroom. He's not sure to solve the problem. He doesn't want any part of it. He knows what's happening. And this is looking at the evidence from the State of Washington. You know, I don't see a big point on a motion like this. Rightfully so. And what we're saying is that as far as the duty is concerned, as relates to the bar, and it's not just the McDonald's, because they were present when the events got out of hand. When the name calling started, and the physical altercation came to be. That was, again, that goes both to the duty, because it's an intentional, maybe criminal act, of punching Mr. Fancy, but also the proximate cause. That's also a foreseeability on the proximate cause. The gentleman left more than an hour before. So the manager can just hide in the bathroom, and all the employees can just look down at the floor, and ignore what's going on in the restaurant? Well, that would be, you know, that pertains to my colleague's client, McDonald's. No, I'm talking about the unit that responds to your client. Let me put it that way. Let me look at that. Because the appellants argue that the heightened foreseeability does not apply to dram shop cases at all, right? And what I'm trying to point out is just because the heightened foreseeability standard hadn't been established by the D.C. Court of Appeals until starting in the 1980s, on through the 1990s. It's been out there a long time. So your client had noticed before he signed this franchise agreement. But the allegation or the complaint in this case, as it relates to the bar defendants, was that Mr. Ward, who had been previously at the bar, an hour before, intentionally sucker-punched Patrick Casey because of his death. And all I'm saying is, no matter the case law from the D.C. Court of Appeals, it's not fair to hold Camelot or any other bars responsible for that conduct, because it's intentional, maybe criminal conduct. Well, I thought that's why these bars have bouncers and have security guards. Because their managers don't hide in the bathroom. They get these guys out of there because they know something's going to happen. We're talking about NOVAC. And one of the other national standards that was recognized in NOVAC is that when there are scuffling or battling groups, you never put them out together at the same time. There's no one worth his salt who would put two conflicting groups out the same door at the same time. You don't let them in. You hold one and put them out the other door, is what the standard of care would be. I mean, the DUI situation, you say everybody knows. Well, everybody knows people who are drunk have diminished judgment.  Well, that's not the point. There's no evidence that anything happened at the bar an hour before, you know, when they were last served at the bars. That depends. If there was a NOVAC case, if there was something developing at our bar, then certainly we'd have that foreseeability of a specific crime that could befall our patrons. Well, I mentioned to dismiss. The argument would be the way the district court framed it. Intentional acts interrupt the chain of causation no matter what. Well, I think it has to with respect to the allegations of the complaint here, because a criminal act is a bright line that has to be drawn. For any criminal act. To demarcate where a bar defendant's responsibility is going to end and the criminal actor's responsibility is going to end. I mean, somebody's dead. And that's where it rests with Mr. Ward. That's where the responsibility rests. This is so serious. It's very sad. I mean, somebody has died. This is sad. It's tragic. Somebody's dead. And the question is, is it fair to hold Camelot and the others responsible for that death, or should it rest with the actor who caused the death, Mr. Ward? No matter how much prior notice they had. And that's as a matter of law. It doesn't matter how much notice they had. You know, I would think, you know, it's not a record of this case. I say it might have been in Maroos in our briefs we sent. Maybe this Officer Clark was known to be a hothead, a racist maybe. Who knows what. Maybe he started the altercation in the bar, or he was going out to shoot the first one he saw and said so. That gives you the kind of heightened foreseeability. I mean, your client's perception is that they call 911. That at least says we tried to do something. We didn't hide in the bathroom. Remember, my clients are just the bars. I'm not representing McDonald's in this case. I'm talking to you as a lawyer who is representing Camelot and Ozzio. Well, maybe I misunderstand, because there's no evidence that the manager went to the bathroom at Camelot or Ozzio. Oh, sorry, then that's wrong. That was McDonald's. All right. It's a tragic thing. The point being that foreseeability is important in determining a duty. Judge Van was right to draw the line on duty as the intentional act and stop it there because that's where it belongs. It's only fair otherwise. Where would you draw it? And then also on proximate cause, goodness gracious, an hour later a block away over an argument that resulted from somebody calling somebody else a fag and then, you know, pushing each other and everything else. And then Mr. Casey almost as an invitation to combat saying let's take this outside and I'll get you all off. That's all very factual, and I understand that. And that may be a reason for summary judgment. That all developed after we were granted a dismissal. Judge Van dismissed on the proximate cause issue just because he felt that that was not a plausible claim stated because it was so far removed. And that was the other point I wanted to make, but I didn't amplify well enough in the brief. I don't know how an hour later, you said that about five or six times, an hour later I could see that at the attenuation, but it's not like that's absolution. It would seem to me for the bar. True. But, you know, it is a state case and we're looking at the state law. Right. Just from the court of appeals, this is the point that I wanted to make.  And it's Casey versus Corson and Drummond, 222. I'm sorry, 221 at second at 51. That case was very, very important. Should have had more time in our brief. That's a DC court of appeals or DC circuit? That was a DC circuit case. Okay. Before the form act.  Okay.  I'm not going to go into the details of what the form act was and what established what we call a gram shop liability. And they decided this. With approval discussing approximate cause issue. This was going back on remand. And what's so significant about that case. He involved another city ordinance. One prohibiting people from leaving ignition keys in the ignition of their cars or vehicles. And the argument was that that was a violation of a safety statute that resulted in a vehicle injury later on. In that case, just hold Scott granted the defendant's judgment at the close of the open state. Based upon the fact that the injury occurred 15 miles south of the truck was stolen. It was so far removed to remote in time, place, and circumstance for it to have been an approximate cause of the vehicle accident down in Pittsburgh. Well, those are the same words just Leon used in explaining his decision on the motion for reconsideration. That this event, as it may be, tragedy is too far removed from the alleged statutory violation to have been an approximate cause. Let me make sure I understand your approximate cause argument. Let's suppose that what was alleged in the complaint and what the facts were, were that all of these people were inside. One of the nightclub defendants and the jawboning began there. And then the bouncers asked them all to leave. And right outside the fight happens. And Mr. Casey is killed. Are you saying that because it was an intentional act that was committed, that resulted in the death, that there wouldn't be proximate cause in that case. And, and that complaint, if it were alleged that way, could be dismissed on the 12D6 motion. Thank you for the question. That's a lot like that. Novak case, Novak first Novak case where the stuff all that erupted between two groups of young men happened in the bar and they were let out into the alley where the fight erupted and went on for several minutes after. And if the court of appeals felt that that met the requirement of a heightened standard, heightened foreseeability, heightened proximate cause foreseeability, that there would be liability under this typical court claim. Now, interestingly enough, but, but they didn't reach the dram shop issue. You know what? And that's, that's the other point I'm trying to make. The dram shop claim was the only one made. There was no claims being made that anything happened at any one of our establishments that would give rise to the heightened, heightened standard, the approximate cost, the heightened foreseeability that Ward was going to go and kill somebody. There's no, there was no allegation, no other claim to that. But interestingly enough, Novak didn't talk about dram shop liability even though it was two groups of young men in a bar. I bet you they were not drinking water, but the plaintiff didn't even claim dram shop liability in that context. And that certainly wasn't the basis for the decision. It wasn't even raised. It certainly wasn't raised as plaintiff's responsibility. I think it's a per se negligence, right? And this is per se without any heightened proximate cause or part. In that case, it was because of the fight involving interrupting in the bar and the act that they took in response that were obviously deficient, according to all that testimony and experience, and putting them outside together. And then much later having the injury, serious injury occurred. Anything further? No, Your Honor. Thank you very much. Thank you. Thank you. Thank you. All right. Thank you, Your Honor. I just have a few points I'd like to make. With respect to the dram shop against the bar defense, the court only needs to look to one reason. It was involved in a situation where an off-duty officer was over-served at a bar, walked outside the bar, and shot someone. That is an intentional lack. That is what created dram shop liability in the District of Columbia. And the court in that decision said the distinction between the intentional lack or negligence is a question of proximate cause for a jury. Well, it didn't exactly say that. If it had exactly said that, it would be 100%. I think you're 90% there. It drew a distinction between the automobile and the gun. And I think the distinction that you're getting at, though, the court, is the gun is an intentional lack. I might agree with you there. So they're getting at it. They didn't exactly say what you said. Thank you for clarification. One other point with the dram shop plan. The issue of, it's important to understand the legal duty here, because it's not the same. The heightened foreseeability applies to the claims against the McDonald's defense, because that is a negligent security case that falls under Novak. The legal duty with respect to the dram shop is created by the statute and the regulation. And the courts are very clear that once there's a violation of that statute, that legal duty, the issue, the remaining issue is proximate cause. And with respect to proximate cause on the dram shop issue, getting into this discussion about one hour, is it too much or is it not enough? That's not a question for motion to dismiss. I mean, the larger question, which maybe is not posed by this case, is how drunk is drunk enough to try to make a bar libel? Because a couple hundred people stream out. And many, if not the majority of them are drunk legally, past .10 or .08 or whatever it may be. And some of them are going to do dumb things that are going to cause injuries to others. And the statute is written as. And the concern, I guess the concern is, can the bars really be held liable for all that ensues? Also, the first question is how drunk is too drunk. That's the question of whether there's a breach of the standard of care. And that's a jury question, right? And with respect to the statute itself, it says intoxicated or physically intoxicated. And in this particular case, there's plenty of eyewitness testimony that identify or describe these panelists as being drunken, out of control, intoxicated, belligerent. So I think that alone would actually get passed the motion for summary judgment. But again, we're at the motion to dismiss phase. One other comment. Well, I'm not going to parse that, but if you're intoxicated, but not visibly intoxicated, that's going to be pretty tough for a bar. I think that situation would probably require expert testimony. And perhaps it's a DUI case where the individual gets pulled over and there's a breath of water. So I think that's how that would need to be proven. And then backtrack from the time, the last drink, to when it dissipated through the blood, the alcohol. Dealing with the McDonald's defendants, there was a comment about the Briggs decision saying, none of this cannot be used to establish standard care. I agree with that. But Briggs does go on to say that internal manuals can be used to establish evidence of standard care. So by itself can't establish standard care, but it is evidence of standard care. And here, the McDonald's security manual coupled with the fact that other facilities, restaurants, have security guards that establishes national standard of care. Do you know that other national restaurants have manuals that require security guards? In this particular case, I can say the security manual was subject to a protective order under Steele. So I presume other national restaurants would treat that information the same. So to answer your question, we don't have that information. With respect to the number of restaurants required, I mean, you could have sought it in discovery. I mean, you could issue third-party subpoenas. And if the information is confidential or a trade secret material, then, you know, it could be subject to a protective order, but we can get it. That is correct, Your Honor. But I think here, looking at the Novak decision, the security expert will also use the same forensic methodology. By the way, McDonald's security expert also used the same forensic methodology from the IA PFC. But in the Novak case, the expert referred to four other restaurants, four of the bars that the circuit found that that was sufficient to articulate the national standard of care. So in this case, we identified, took the depositions of two other restaurants, who then identified a third of their restaurants that had a security guard. And in addition, we have the outstanding motion of health that we think would have been sufficient evidence without having to do the third part. Weren't those all corporate-owned McDonald's? I'm sorry? Weren't those all corporate-owned McDonald's? Well, I think that's accurate. But it still goes to the standard of care. You know, the national standard of care is not referring to franchisee-owned restaurants or corporate-owned restaurants. It's similar restaurants. And I think corporate, you know, based on McDonald's system, which requires uniformity across all their restaurants, that is a good indicator for the national standard of care. It requires uniformity as to certain things. It doesn't require uniformity as to security guards, or else, you know, the franchise agreement would say that. It doesn't. That is correct. But, you know, as far as articulating national standard of care, there isn't, you know, for example, in the Mid-Mount case. There's not going to be a document that says, this is the national standard of care. It's experts who come in and base it on their experience, based on competing facilities, based on treatises, recognized methodologies, and we believe that's what happens here. Well, counsel, I thought was making the point, though, that maybe McDonald's, I thought counsel was making the point that maybe McDonald's just operates under a higher standard of care. That's not evident on national standards. Well, so, with respect to the two other restaurants, that was done, the decision to hire a security guard had to do with the area in which those restaurants were located. They were located near bars, and the corporate designee testified that what would happen is, late at night, they would get this huge influx of intoxicated patrons, and this was done in consultation with the regional security manager for McDonald's Corporation, and due to that influx of intoxicated patrons, they felt it was necessary to hire a security guard to keep their customers safe. And, in fact, in those two restaurants, it was testified that there's never been a violent altercation since they've had the security guard. One other point with respect to calling 911. I want to clarify something. The witness testimony is that this verbal altercation and yelling occurred over a three- to five-minute period. During this period, the manager for McDonald's restaurant testified, or submitted an affidavit that stated it was clear from the yelling, everyone in the restaurant could hear the yelling, it was clear from the yelling there was going to be a fight. I thought the argument now is that this was never raised below, so it's forfeited. That was raised below. All right. And, in fact, our expert even articulated that the national standard of care required McDonald's restaurants to call 911. And he based that on the fact that the corporate designee for McDonald's Corporation testified that, at that moment, McDonald's policy required that they call 911. And so, referring to, you know, the 103 McDonald's corporate-owned restaurants in Washington, D.C., that references the national standard of care. But, again, that is something that can be as well within the province of the jury. That expert testimony is not required for whether the decision to call 911 is, and it can be decided by the layman based on their common understanding. I guess what I need to clarify is that the parties had agreed in the district court that expert testimony was necessary? So, Plaintiff never made that concession. In fact, Plaintiff even cited to the restatement 314A in the Southland decision, which both speak, especially in Southland, which is a Maryland case, that, in that particular case, there was an assault at a gas station. The gas station owner, or the attendant, or the staff at the gas station, saw that there was an assault occasion was happening, and they failed to call the police. And the Maryland Court of Appeals found that was the basis for liability without any expert testimony. With respect to McDonald's Corporation, which I don't think was discussed, I'll just touch on it briefly. The franchise agreement requires the contract between the franchisee and the McDonald's Corporation. It requires that the franchisee adhere to the McDonald's system, which is a uniform set of policies. Part of that McDonald's system includes security manuals, or business manuals, which includes a security manual. And the McDonald's Corporation also exercises control of the franchises by conducting routine inspections, which includes questions on security. If they fail those inspections, the franchise can be terminated. So we believe that that's an independent source of liability against McDonald's Corporation through the Bechtel case. If the Court doesn't have anything further, I'm happy to conclude. Thank you. I will take the case under advisement.
judges: Rogers, Kavanaugh, Wilkins